RAMIRO GALVAN, ALIAS RAUL GALVAN, V. THE STATE.

No. 17221.   Delivered March 27, 1935.
Rehearing Denied October 16, 1935.
Leave to File Second Motion for Rehearing Denied November 13, 1935.

MORROW, Presiding Judge, dissenting.

The opinion states the case.

*Carroll W. Smith,* of El Paso, for appellant.

*Roy Jackson,* Dist. Atty., of El Paso, and *Lloyd W. Davidson,* State's Atty., of Austin, for the State.

LATTIMORE, JUDGE.—Conviction for murder; punishment, death.

The testimony in this case warranted the jury in finding appellant guilty, and in the assessment of the extreme penalty of the law. The testimony for the State showed appellant to be engaged in smuggling contraband across the Rio Grande River some twenty-five miles below El Paso. Mr. Scotten, deceased, was a Federal border patrolman. He was shot through the hip in a battle with smugglers, and later shot through the head, the skin around the hole in the head showing powder burns. His two army regulation 45 pistols, his ring, watch and flashlight were taken from his person. The killing was near a crossing on the Rio Grande, and on the Mexican side of the river was the village of San Ysidro where appellant lived. The battle between the officers and the smugglers occurred in the early morning on July 20, 1929. The officers were watching the crossings to prevent contraband entries and saw a man on horseback come across the river just before day. Upon being hailed and informed that the party were Federal officers, the man on horseback fired upon them and tried to escape on his horse. The officers returned the fire and the horse was killed. He was carrying a quantity of alcohol. The two officers then went down to another crossing, got two more men, and the four came back to the scene. As they were getting out of their car they were fired on from several directions. It was at this time that Scotten was shot through the hip. The officers, feeling themselves outnumbered, retreated and procured reinforcement. Upon their return to the car they found Scotten dead. A State witness who had known appellant well, described his rather peculiar clothes, and positively identified him as one of a party of men whom he saw going back from the scene of the shooting toward the river crossing after the battle. Griego, another State witness who lived in San Ysidro at the time, swore that appellant's business was smuggling, and he heard appellant say the night before the battle that he was going to take a load across the next morning on horseback. The next morning witness saw appellant and other Mexicans whom he named, in San Ysidro going toward the crossing, and presently heard shooting on the American side, and saw the same men come back across the river with two automatic

pistols, and appellant had a flashlight. The men were laughing about what they had done. They said they had killed a Federal officer. They further said he had fallen and crawled under the car, and they pulled him out by the belt, turned him over, found he was not dead, and they shot him in the head. Appellant also had one of the automatic pistols. Witness did not see appellant cross the river on the horse, but heard him say he did, and that he lost his hat when he tried to run away on the horse.

The State used two brothers named Rodriguez, whose father lived in San Ysidro at the time of the killing. As we understand the record, said witnesses then lived in El Paso, but were visiting their father on July 19, 1929. They heard the shooting the next morning, got up and went down to the river bank to a position where they could see what was going on, and both testified that they saw appellant across on the American side shooting with a rifle at a car up the road. Later, according to their testimony, appellant and other men came across to the Mexican side. Appellant had a 45 automatic pistol. They heard him tell the others that he appreciated what they had done, but that he did the killing and felt glad over it. Another witness testified that after this killing he and his brother were driving at night without lights on the American side of the river, and were stopped by some one waving a flashlight across the road. Three men, one of them appellant, held these witnesses up and took their property. One of these witnesses identified one of the robbers and called him by name. Their property was then returned, and members of the party turned the matter aside by saying that because witness had no lights on his car they thought the men to be Federals. Some one of the party said they had f—d some Federal sons-of-bitches, and appellant said "Here is the flashlight of one of them, the Scotten flashlight." When appellant was arrested at the home of one Garcia in San Ysidro he was in a room up on top of a quantity of hay. No other person was in the room. The arresting party found in said room a 45 regulation automatic pistol with the number filed off so it could not be identified.

Appellant, as a witness, denied being present or taking any part in the battle, and claimed he spent that night on the road from Juarez to San Ysidro because of a disabled car in which he had gone to Juarez after groceries. He said he heard of the battle when he got back to San Ysidro. He testified that at the time of the shooting he was somewhere on the road between Juarez and San Ysidro and knew nothing of it. He denied be-

ing a member of the party that held up and robbed the witness Parada, and denied making the statement that he had the flashlight of Mr. Scotten.

Appellant complains in bills of exceptions 2A and 3 of the rejection of testimony, in effect, that in February, 1932, appellant, who was an officer in Mexico, in company with other officers, arrested the father and brother of the two Rodriguez witnesses and took said party to Juarez, where they were tried and the father was acquitted, but the brother pleaded guilty and was given six months in jail. In his qualification to these bills the trial court certifies that both the Rodriguez witnesses denied any knowledge of the matters referred to, and that there was no testimony in the case showing or tending to show that said witnesses knew of the transaction in question.

We recognize the rule to be that the motives, animus or prejudice of any witness are material for inquiry and proof, and that any party to a trial has the right to prove facts which directly or indirectly show animus or prejudice on the part of any witness against him. There is no trouble about the rule. The trouble here is over what appears or rather does not appear to be the showing of such state of case as requires application of the rule. The bills of exception do not show where the Rodriguez witnesses lived in 1932, at the time of the alleged occurrence of the arrest of their relatives by appellant and other officers. The bills show that the father was discharged and the brother pleaded guilty. There is no showing that either of these witnesses were present at the trial, or that they knew of or had heard of the arrest or trial, or that appellant played any special or prominent part in such arrest or had anything unusual to do with it. The trial court certifies there was no such testimony. Neither of said witnesses was asked upon the trial whether he had any animus or ill-feeling toward appellant, nor was there any other testimony offered showing either directly or indirectly such facts as would lead to the conclusion that there was ill-feeling, prejudice or animus on the part of such witnesses.

Of course, the purpose of such proof is, as far as it would go, to cast doubt on the credibility of the Rodriguez witnesses and to that extent impeach them, but an inference can not rest upon nothing more substantial than another inference, and this is specially true when there appears as supporting inference number two only a third deduction. The first thing inferred would be enmity or ill-will on the part of the Rodriguez brothers. The inference of such ill-will would arise from their

knowledge of the fact that appellant, in company with a group of other officers, had arrested their relatives. There being no testimony showing either directly or indirectly any knowledge on the part of said witnesses of appellant's conduct in the matter, there can be nothing to support such inference of knowledge. Nothing else is suggested to cause prejudice, ill-feeling, dislike or enmity on the part of said witnesses. As far as we are able to appraise said bills of exception, they wholly fail to set out any action on the part of appellant, or those associated with him, in the arrest referred to, to indicate other than the ordinary discharge of a duty on the part of a group of officers. As far as we can tell they were acting entirely within the scope of their official duty in making the arrest. It is not shown that appellant filed any complaint, or that he took any part in the prosecution, or was a witness in same, or had anything whatever to do with it other than going as one of the party in making the arrest. Ill-will or ill-feeling on the part of some one related to the parties arrested, in such state of case, would seem to be rather a far-fetched inference itself.

We would hestitate to reverse a case upon no stronger showing of injury than the mere rejection of testimony offered to show hostility on the part of a witness, which testimony went no further than to show that the accused was one of a group of officers who had executed a warrant of arrest in a regular way upon a relative of the witness. The case of Burnett v. State, 53 Texas Crim. Rep., 515, is referred to. See also Link v. State, 73 Texas Crim. Rep., 82.

We do not think bill of exceptions No. 11 presents any error. If we understand the record, it was made known to the court after this case was on trial that appellant desired a recess in order that his attorney might have a conference with a group of witnesses in Mexico to ascertain what they knew about this case, and if possible to get them as witnesses. The record seems to support the proposition that permission to bring witnesses bodily across the river in order to use them as witnesses, was a matter entirely within the discretion of the Federal Immigration Department. The judge trying this case had no power or authority to compel said immigration officers to admit parties into the United States in order that they might be witnesses. The record shows, however, that the judge did stop the trial and grant to appellant's attorney the right to go to the Mexican side and interview his witnesses and make an effort to get them across the river. It was agreed

that a representative of the district attorney's office should accompany appellant's attorney to Juarez on the Mexican side, and that the witnesses should be interviewed by both parties together. It is further shown that out of the number of witnesses thus interviewed seventeen were agreed upon by the defendant's attorney and the State's attorney, and a list of their names was furnished the Federal Immigration Officer with a request to him to admit these seventeen witnesses provided all came together. It is further shown that seventeen witnesses did present themselves, but upon investigation the immigration officer found that five of the original seventeen had been withdrawn and five others substituted. He declined to let them come across. When this matter was made known to the trial court he declined to further pass the case and the trial proceeded. No effort had been made by appellant's attorney to take the deposition of these witnesses as is provided for out of State or foreign witnesses. We see no error on the part of the trial court in the matter.

There are a number of other bills of exception presenting minor complaints, all of which have been examined, and in none of which do we find any error.

The judgment will be affirmed.

*Affirmed.*

### ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—Appellant moves for rehearing, again urging the same points presented and considered on original submission.

The only matter regarding which this court has been disturbed, or which has given rise to different views among the members of the court is the question presented in bills of exceptions Numbers 2-A and 3, and there is no difference as to the legal principle involved, but only as to its application. Said bills disclose that appellant offered to prove by appellant and one White that appellant and other officers arrested the father and a brother of State's witnesses Mateo and Ignacio Rodriguez upon a charge of theft of cattle from White; that the father and brother were taken to Juarez and upon a trial the father was discharged and the brother upon his plea of guilty was sent to jail for six or eight months. Upon the State's objection the evidence was excluded. The bills themselves do not show upon what ground the evidence was offered, nor the ground of objection urged by the State. The qualification to each of the

bills shows that when Mateo and Ignacio Rodriguez were being cross-examined by appellant's counsel they each testified that they had no knowledge of the matters inquired about. The court states in his qualification that the objection urged by the State was that it had not been shown that either of said witnesses had any knowledge of the transaction sought to be proved. The court further states that "the matters of fact stated in the objection" were true, and that when the objection was sustained he advised counsel for appellant that if any testimony was offered tending to show that the witnesses Mateo and Ignacio Rodriguez had knowledge or information as to the matters about which appellant and White offered to testify he would admit the offered testimony. The killing for which appellant was on trial occurred in July, 1929. The transaction regarding the arrest of the witnesses' father and brother occurred in February, 1932. The indictment against appellant was returned in March, 1934, and the trial had in May, 1934. The two Rodriguez witnesses lived in El Paso at the time of the killing and were visiting their father and other relatives in San Ysidro. After the killing, and the same day, they returned to El Paso, and it may be inferred from the record that they continued to live in El Paso up to the time of the trial. They never voluntarily reported to any officer what they knew about the killing in 1929. It appears from their own evidence—and there is no other on the point—that a Mr. Griffin, a United States officer, was the first officer to interrogate them about the matter, and they then for the first time—which was sometime in 1933—disclosed to officers what they knew of the killing of Scotten. This record contains no testimony showing any act or word of either of the Rodriguez witnesses which would indicate ill-will, animus or malice towards appellant. Appellant's contention seems to be that if he had been permitted to prove that the father and brother of the two Rodriguez witnesses had been tried in Juarez for theft of cattle from White then it might be inferred under all the facts in evidence—although against their own positive testimony—that the two witnesses knew of such trial, and then upon the knowledge thus inferred, base a further inference that they also knew of appellant's connection with such arrest, and then a further inference that such arrest caused the two witnesses in question to entertain ill-will, animus and malice towards one of the officers engaged in making it; notwithstanding the testimony of the two witnesses is in harmony with the evidence of other witnesses whose attitude towards appellant is not questioned.

The animus of a witness is never immaterial, and while the courts have been liberal in permitting inquiry regarding it, we are of opinion the matter here comes in such a way as to be too speculative and with no probative force. We refer to Burnett v. State, 53 Texas Crim. Rep., 515, 112 S. W., 74, and quote therefrom the language of Judge Ramsey as follows: "Again, error is assigned to the action of the court in refusing to permit the witnesses Wise and McKee to testify that the State's witnesses were prejudiced and hostile to appellant on account of his having aided the officers in running down criminals among the negroes in that section of the city. It appears from the record that this matter arose in this manner: While the witnesses, Wise and McKee, were on the stand, they were asked the following question: 'Do you know whether or not there was any animosity and ill-feeling existing among these negro witnesses out there at Locksboro against the defendant, and if so, what it was for?' It was stated that appellant expected the answer of the witnesses to be that as an officer of the law, that he knows all about it and that these negroes out there, particularly the witnesses, had at the time of the homicide and now have an enmity and animosity against the appellant, and that he expected further to show by said witnesses that the reason for such enmity and animosity was on account of appellant being an assistant of the officers and that he had incurred the enmity of these witnesses; that this testimony was offered for the purpose of impeaching these witnesses. On the trial there was no question asked of any witness as to his state of feeling towards appellant, nor was there any effort made to show any unkindness, animosity, or ill-will; it is not shown that the witness named had personal knowledge of the feelings, or attitude of any particular witness towards appellant, nor was he interrogated with reference to the feelings, attitude or disposition of any particular witness towards appellant; nor is it shown that he had personal knowledge, or are the means of such knowledge, in respect to the attitude of any particular witness, shown. It is rather, we think, an effort upon the part of counsel for appellant to show the conclusion or belief of the witness in respect to this matter as deduced from the activity of appellant in aiding them in ferreting out crimes in that neighborhood. There can be, we think, no doubt that it is always permissible in every case where it can be shown by competent evidence, to make proof of the hostile attitude of any witness in respect to any party or any cause before the court, such evidence is clearly admissible for the purpose of affect-

ing the credibility of witnesses and the weight of their testimony. 2 Enc. of Ev., p. 406, Surrill v. State, 29 Texas App., 321, and Watts v. State, 18 Texas App., 381. But before in any case such testimony will be permitted it ought to be shown that the witness in fact knew the feelings, attitude and disposition of the witnesses about whom he is testifying, and in no case, under the guise of stating such attitude, should a witness be permitted to testify to other transactions from which he might or would deduce a conclusion of such hostile attitude or feeling. * * *"

Believing proper disposition was made of the case in our original opinion, the motion for rehearing will be overruled.

*Overruled.*

MORROW, Presiding Judge (dissenting).—The State's evidence is to the effect that on the morning of July 20, 1929, and during the night preceding it, there was an encounter during which many shots were exchanged between United States officers who were engaged in the Border Patrol Service and persons residing in the Republic of Mexico, who were attempting to invade the United States and bring into it contraband property in violation of the law. During the conflict mentioned one of the United States officers named Ivan Scotten was killed. There was evidence introduced by the State to the effect that appellant was one of those acting with the invaders and one of those who personally fired a shot into the body of Scotten after he was wounded. According to the testimony, at the time of his death Scotten was reputed to have possessed certain property consisting of pistols, a flashlight, ring and wrist watch, and that some parts of the property mentioned were found in the possession of the invaders including the appellant.

A witness for the State testified that the appellant was in the habit of wearing a peculiar suit of clothes, and that on the occasion of the encounter mentioned, he had been seen as one of the invaders and recognized by the manner of his clothes. It was the State's theory from this witness and others that appellant went back into Mexico after the encounter ended.

Among the witnesses used by the State were two brothers by the name of Rodriguez, one Matillo (or Mateo) and the other Ignacio. These witnesses were definite in their testimony identifying the appellant as one of the invaders and one who was personally connected with the homicide.

Appellant testified in his own behalf to the effect that

in July, 1929, he was living at San Ysidro, Mexico; that on the 19th of July, he was traveling to Juarez, Mexico. He said he was not carrying beer, whisky or contraband goods, but that after securing in Juarez the supplies for which the journey was made, he left for San Ysidro about five or six o'clock in the afternoon; that due to bad conditions of the road and bad tires, he did not reach San Ysidro until six or seven o'clock the next morning. He then learned from a friend that the fight described by the State's witnesses had taken place during the night. At that time Gregorio Ortega told appellant they had come from a fight which they had had with the Federal officers. Ortega exhibited some arms which he had, namely, a .45 calibre pistol and a .30 calibre carbine rifle. Ortega told appellant that Francisco Velasquez had killed a Federal. Appellant said he knew Mateo Rodriguez and Ignacio Rodriguez, and said that he saw neither of them on the morning of the tragedy. He said he knew Jose Griego but did not see him that morning. Appellant also testified that in 1929 Francisco Velasquez was the chief of the so-called Defense Social or Reserve Guards; that some years later he resigned and appellant succeeded him in that capacity.

In his motion for rehearing appellant complains of the rulings of the court as set out in Bills of Exception Nos. 3 and 2-A. The bills in question show that J. K. White, a witness for the appellant, as well as the appellant, would, if permitted, have testified that in February, 1932, a cow belonging to the said White was stolen; that the animal was later located on the premises of the father of Ignacio and Mateo Rodriguez; that at the time appellant was an officer in the town of San Ysidro and arrested the father and brother of the Rodriguez witnesses and carried them to Juarez, where Jose Rodriguez entered a plea of guilty and was sentenced to six or eight months' confinement in jail and that Ignacio Rodriguez, the father, was discharged. Appellant sought to introduce such proof in an effort to show that the Rodriguez witnesses were actuated by malice in testifying that appellant was the slayer of the deceased. The court qualified the bills of exception to the effect that upon cross-examination both Ignacio and Mateo Rodriguez denied that they had any *knowledge* of the *arrest* of their *father* and *brother* and of the *incarceration* of their *brother* in the Juarez jail. The bills are further qualified to the effect that it was not shown in the testimony that said witnesses had knowledge of the facts mentioned.

It is apparent from the qualification that the trial court en-

tertained the view that it was incumbent upon the appellant to establish by direct proof the fact that the witnesses knew of the incidents mentioned before proof of same would become admissible. In this we think the court was in error. The testimony of both witnesses was to the effect that they frequently visited in Juarez and visited the home of their father. In short, if the court had permitted the appellant and the witness White to give the testimony shown in the bill of exception, the inference could properly have been drawn by the jury from the circumstances in evidence that said witnesses were aware of the activities of the appellant in connection with the arrest of their father and brother and were actuated by malice in testifying against the appellant.

The homicide occurred about the 20th of July, 1929. Appellant was indicted at the January term, 1934. As already shown, Ignacio and Mateo Rodriguez were among the principal witnesses against the appellant. Ignacio Rodriguez testified that he got to the river as the battle with the officers was ending. He observed appellant standing at the car which the officers had abandoned and saw him shoot a rifle. Shortly thereafter appellant came to the river and crossed into Mexico. He had a pistol in his holster around his waist, and a .30-30 rifle and a .45 calibre automatic pistol in his hand. After getting across the river appellant stopped and talked to some men there, saying to them: "Well, boys, I killed him." Mateo Rodriguez gave substantially the same testimony as did Ignacio Rodriguez.

From the testimony of Mateo Rodriguez on cross-examination we quote as follows: "After this trouble was over I told my daddy about seeing Raul shooting at the car. Later I heard some people say that Ivan Scotten had been killed, but I didn't know what the officer's name was at that time. All I can tell you is what I see there. I see Galvan standing there shooting towards the car with a rifle. Yes, I stated in my preliminary hearing testimony that I heard Galvan say that he did the most good because he killed the officer. I didn't have any reason to report that to any officer here in El Paso. Yes, I was not an American citizen and living in El Paso. No, I am not an American citizen. I do believe in the enforcement of the law. No, I didn't report that incident to any one down there nor when I came back to El Paso. The reason I reported it at this time was that Mr. Griffin came down there and asked me did I know anything about it and I told him what I knew; Mr. Fred Griffin from Fabens. I told him about it what I am tell-

ing you. It might have been a little better than a year ago when I was telling him about it; might have been a year. * * * I don't remember when it was that I reported that to Mr. Griffin. I don't remember exactly. I believe it was in September,. 1933, or somewhere around there; of course, I was getting my passport fixed and I remember that I was coming from the Immigration Office towards my house when I met him, as far as I can remember. If back in February, 1931, Mr. White who resides across from San Ysidro lost some cows and a few days after these cows were lost Raul was on the Home Guard or Chief of the Municipal Guards down there at San Ysidro and instrumental in finding these cows or the hides of these cows, buried in the front of my father's house, then what have I to do with that? I don't know anything about it; I have never heard my father discuss it. I didn't know that Raul was Chief of the Municipal Guards at that time down there. I don't know whether he was an officer or what he was. I don't know if my father was arrested at that time and taken to jail in Juarez; you know better than I do, I don't know. I can't tell anything about that trouble. I don't know what kind of trouble they been in. I don't know if my father served six months in jail. If you know; I don't know anything about it. I can't tell you if I visited down there during the year 1931, I visited down there very often. * * * I haven't missed my father down there. Every time I feel like going down there and visiting him I find him there. My brothers, Jose and Carlos, or any of the rest of them were never arrested down there; not that I know of by this man here, the defendant, or his Lieutenant Corona, * * * No sir, I don't know that this defendant Raul arrested my father and took him to Juarez and that he spent six months in jail; I don't know what kind of trouble they have been in over there or whether they had any trouble or not. I can't tell you anything about it. I don't know if that offense was taking the cattle from this side."

From the cross-examination of Ignacio Rodriguez we take the following testimony: "I told nobody that I can remember of about this incident at San Ysidro after I came back to El Paso. I was living in El Paso at that time; I am not an American citizen. Yes, I believe in the enforcement of the law. No, I didn't report the fact that I had seen Raul shooting towards the car at that time; I never said anything until Mr. Griffin went out and called me; he went over there to make an investigation; he went over there to see what I knew about it and I just told him what I knew about it. I don't think I would

have said anything about seeing Raul shooting at the car if Mr. Griffin hadn't said anything to me about it. * * * I don't know if some time back there in 1931, some time after February, that there was a little trouble between my father and Jose and Raul. I never heard anything about Raul say anything about them finding some hides out there in front of the house of Mr. Rodriguez. I never heard them say anything about Mr. Rodriguez or any of the boys being in the Juarez jail."

On re-cross examination Ignacio Rodriguez testified in part as follows: "I don't know if my father and brother were placed in the Juarez jail; No, sir, I don't know if the Federal Officers came down to San Ysidro during February, 1931, to investigate about the hides of some cattle that had been stolen from Mr. White and that Galvan assisted the officers and that my brother plead guilty to stealing the cattle and got six months in the Juarez jail."

Mateo Rodriguez, on re-cross examination, testified as follows: "No, I don't know that my brother Jose was arrested back in 1931 by the Juarez officers and that he was charged at that time with theft of cattle from Mr. White across the river and that the hides were found around my father's house at that time and that Raul Galvan assisted the Federal Officers in making the arrest. I don't know' a thing in the world about that."

It has been observed that the testimony of the Rodriguez witnesses, if true, discloses that they knew for years that the appellant was guilty of murder; that they made no disclosure of it until after the appellant had displayed some activity in bringing about the arrest, prosecution and conviction of some of the relatives of the Rodriguez witnesses. In their testimony on the trial the Rodriguez witnesses disclaimed any knowledge of such activities on the part of the appellant. They disclaimed knowledge that their near relatives had been convicted and incarcerated. They left with the jury the impression that their activities against the appellant were inspired by no reason save a patriotic desire to aid in bringing a criminal to justice. Appellant would have testified on the trial in the presence of the jury that he had been an actor in the prosecution and conviction of some of the relatives of the prosecuting witnesses. The court denied him that right to make that disclosure before the jury.

It is thought by the writer that the refusal to permit the appellant to make the statement proffered by him in the presence of the jury was not justified but impinged upon his right

to have the jury, in the light of all the testimony, to determine his guilt or innocence, and especially determine whether the activities of the prosecuting witnesses mentioned were inspired by malice or bias against the appellant; that under the circumstances, the right of the appellant to have the jury to determine whether the evidence against him by the witnesses in question in this discussion was true or false is clear. The precedents on the subject of animus, that is to say, of the right to bring before the jury by competent evidence proof of the hostile attitude of a witness in respect to any party or any cause before the court are numerous. Its relevancy as affecting the credibility of the witnesses and the weight of their testimony is a recognized principle of law.

In the case of Burnett v. State, 53 Texas Crim. Rep., 515, this court, speaking through Judge Ramsey, said: "There can be, we think, no doubt that it is always permissible in every case where it can be shown by competent evidence to make proof of the hostile attitude of any witness in respect to any party or any cause before the court, such evidence is clearly admissible for the purpose of affecting the credibility of witnesses and the weight of their testimony. 2 Ency. of Ev., p. 406; Surrell v. State, 29 Texas Crim. App., 321, and Watts v. State, 18 Texas App., 381."

The hostility or friendship of a witness towards parties is always a factor to be considered in appraising his testimony. See Wharton's Cr. Ev., 11th Ed., Vol. 3, sec. 1417. In sec. 1418, of the same text, it is said: "The motives of the witness may affect his credibility. The degree of credibility to which a witness is entitled depends as much upon the influence and inducements he may have to swerve him from the truth as upon his moral character. Thus, the motive of a person inspiring a criminal prosecution tends to discredit him as a witness." To debate the subject of the admissiblity of facts which affect a witness or influence him in shaping his testimony or conduct would be useless as it would tend to demonstrate that which is obvious. Upon this all text-writers agree. See Underhill on Cr. Ev., 3rd Ed., p. 565, sec. 390; Wharton's Cr. Ev., 10th Ed., Vol. 2, p. 767; Corpus Juris., Vol. 70, p. 937.

The writer is impressed with the view that the conviction of the appellant should be reversed and returned to the trial court for a new trial. My associates having reached a different conclusion, I respectfully enter my dissent.

APPLICATION FOR LEAVE TO FILE SECOND MOTION
FOR REHEARING.

LATTIMORE, JUDGE.—Appellant asks leave to file second motion for rehearing. We are not at liberty to consider ex parte affidavits which accompany appelant's request. Same relates to matters which should have been presented to the trial court at the time of the trial. The record made here is not subject to any such attack. We have again looked over the matters referred to in appellant's application, which are germane, and are not led to believe any error was committed in our disposition of the case.

The request is denied.

*Denied.*